UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. _____

UNITED STATES OF AMERICA,

Plaintiff,

vs.

1000 SQUARE METERS OF LAND IN BAVARO,
DOMINICAN REPUBLIC, and

1000 SQUARE METERS OF LAND IN BAVARO,
DOMINICAN REPUBLIC, and

540 SQUARE METERS OF LAND IN BAVARO,
DOMINICAN REPUBLIC, and

4,409 SQUARE METERS OF LAND IN BAVARO,
DOMINICAN REPUBLIC, and

2,691.52 SQUARE METERS OF LAND IN BAVARO,
DOMINICAN REPUBLIC, and

1,839.00 SQUARE METERS OF LAND AND
CABANAS IN BAVARO, DOMINICAN REPUBLIC, and

198.00 SQUARE METERS OF LAND IN BAVARO,
DOMINICAN REPUBLIC, and

14,377.00 SQUARE METERS OF LAND IN BAVARO,
DOMINICAN REPUBLIC, and

7,860.64 SQUARE METERS OF LAND IN BAVARO,
DOMINICAN REPUBLIC, and

2,515.44 SQUARE METERS OF LAND AND
CABANAS IN BAVARO, DOMINICAN REPUBLIC, and

2,000 SQUARE METERS OF LAND AND CABANAS
IN BAVARO, DOMINICAN REPUBLIC, and

2,634.75 SQUARE METERS OF LAND IN HIGUEY,
DOMINICAN REPUBLIC, and

ALL FUNDS IN INTERCREDIT BANK ACCOUNT
NUMBER 16008310760 (JOSE BENITEZ).

                              Defendants.

_____/


## COMPLAINT FOR FORFEITURE *IN REM*

Plaintiff, the United States of America, files this civil Complaint for Forfeiture *in rem* of

the defendants and alleges as follows:

1.       This is a civil action for forfeiture *in rem* of twelve (12) parcels of real estate

located in the Dominican Republic and one (1) domestic bank account.

2.       Subject matter jurisdiction is vested in this Court pursuant to 28 U.S.C. §§ 1331,

1345, 1355(a), and 2461.

3.       This Court has *in rem* jurisdiction in this matter pursuant to 28 U.S.C. §§ 1355(b),

1355(d), and 2461(b).

4.       The Court has venue pursuant to 28 U.S.C. §§ 1355(b)(1) and (2), and 1395(a), in

that the acts giving rise to the forfeiture occurred within the Southern District of Florida.   The

Court has venue pursuant to 18 U.S.C. § 981(h) in that this is the judicial district in which a

related criminal prosecution is pending, *United States v. Carlos Benitez, et al.*, Case No.

08-20440-CR-GOLD.

5.       The defendant real properties, including all buildings, improvements, fixtures,

attachments, and easements, are as follows:

           A.       1,000 square meters of land in Bavaro, Dominican Republic, and more

           particularly described as:

> PARCELA 86, DEL DISTRITO CATASTRAL No 11/4ta
> DEL MUNICIPIO DE HIGUEY, CON UNA
> EXTENSIÓN SUPERFICIAL DE 1,000 METROS
> CUADRADOS. Constancia Anotada matrícula No.
> 3000064483, Libro No. 0425, Folio No. 060, a nombre de
> HB Inversiones del Caribe S.A.

B.     1,000 square meters of land in Bavaro, Dominican Republic, and more

particularly described as:

> PARCELA 86, DEL DISTRITO CATASTRAL No 11/4ta
> DEL MUNICIPIO DE HIGUEY, CON UNA
> EXTENSIÓN SUPERFICIAL DE 1,000 METROS
> CUADRADOS. Constancia Anotada matrícula No.
> 3000064501, Libro No. 0426, Folio No. 103, a nombre de
> HB Inversiones del Caribe S.A.

C.     540 square meters of land in Bavaro, Dominican Republic, and more

particularly described as:

> PARCELA NO. 95-A-4-D-10, DEL DISTRITO
> CATASTRAL NO. 11/4TA DEL MUNICIPIO DE
> HIGUEY, CON UNA EXTENSIÓN SUPERFICIAL DE
> 540 METROS CUADRADOS. Certificado de Título
> matrícula No. 1000002911, Libro No. 0260, Folio No. 7, a
> nombre de Ibrahin Martinez Jaime y Milagros Pimienta
> Jaca. Adquirido de José Manuel Benítez en fecha 12 de
> noviembre del 2004.

D.     4,409 square meters of land in Bavaro, Dominican Republic, and more

particularly described as:

> PARCELA NO. 86-R DEL DISTRITO CATASTRAL NO.
> 11/4TA DEL MUNICIPIO DE HIGUEY, CON UNA
> EXTENSIÓN SUPERFICIAL DE 4,409 METROS
> CUADRADOS. Constancia Anotada matrícula No.
> 3000138126, Libro No. 0482, Folio No. 168, a nombre de
> Carlos Manuel Benítez.

E.     2,691.52 square meters of land in Bavaro, Dominican Republic, and more

particularly described as:

> PARCELA NO. 86 DEL DISTRITO CATASTRAL NO. 11/4TA, DEL MUNICIPIO DE HIGUEY, CON UNA EXTENSIÓN SUPERFICIAL DE 2,691.52 METROS CUADRADOS. Constancia Anotada matrícula No. 3000155159, Libro No. 0497, Folio No. 110, a nombre de HB Vista Bavaro, S.A.

F.      1,839.00 square meters of land and Cabanas in Bavaro, Dominican

Republic, and more particularly described as:

> PARCELA NO. 86-SUBD-3-007.5021, DISTRITO CATASTRAL NO. 11/4ta, DEL MUNICIPIO DE HIGUEY, CON UNA EXTENSIÓN SUPERFICIAL DE 1,839.00 METROS CUADRADOS, A NOMBRE DE EL GUATEQUE S.A. Certificado de Título matrícula 1000008889, Libro No. 0282, Folio No. 175, Hoja 113. Transferido mediante Contrato de venta a la compañía HB Inversiones del Caribe, S.A. en fecha 18 de diciembre de 2003, legalizado ante el Notario Público Dr. Manuel Joaquin Patricio Guerrero.

G.      198.00 square meters of land in Bavaro, Dominican Republic, and more

particularly described as:

> PARCELA NO. 86 DEL DISTRITO CATASTRAL NO. 11/4TA DEL MUNICIPIO DE HIGUEY, CON UNA EXTENSIÓN SUPERFICIAL DE 198 METROS CUADRADOS. Constancia Anotada matrícula No. 3000155160, Libro No. 0497, Folio No. 111, a nombre de Mario Vigil Tijerino.

H.      14,377.00 square meters of land in Bavaro, Dominican Republic, and

more particularly described as:

> PARCELA 86 DEL DISTRITO CATASTRAL NO. 11/4ta, DEL MUNICIPIO DE HIGUEY, CON UNA EXTENSIÓN SUPERFICIAL DE 14,377.00 METROS CUADRADOS, A NOMBRE DE HT BAVARO INTERNATIONAL. Constancia Anotada matrícula No. 1000001342, Libro No. 0250, Folio No. 226, Hoja 156, a nombre de HT Bavaro International.

I.      7,860.64 square meters of land in Bavaro, Dominican Republic, and more

particularly described as:

> PARCELA NO. 86 DEL DISTRITO CATASTRAL NO.
> 11/4TA, DEL MUNICIPIO DE HIGUEY, CON UNA
> EXTENSIÓN SUPERFICIAL DE 7,860.64 METROS
> CUADRADOS. Constancia Anotada matrícula No.
> 3000155166, Libro No. 0497, Folio No. 108, a nombre de
> HB Vista Bávaro, S.A.

J.      2,515.44 square meters of land and Cabanas in Bavaro, Dominican

Republic, and more particularly described as:

> PARCELA 86-SUBD-3, DISTRITO CATASTRAL NO.
> 11/4ta, DEL MUNICIPIO DE HIGUEY, CON UNA
> EXTENSIÓN SUPERFICIAL DE 2,515.44 METROS
> CUADRADOS. Constancia Anotada matrícula No.
> 3000085354, Libro No. 0438, Folio No. 170, a nombre de
> HB Vista Bavaro S.A.

K.      2,000 square meters of land and Cabanas in Bavaro, Dominican Republic,

and more particularly described as:

> PARCELA 86-007.5022, DEL DISTRITO CATASTRAL
> NO. 11/4ta, CON UNA EXTENSIÓN SUPERFICIAL DE
> 2,000.00 METROS CUADRADOS, A NOMBRE DE
> COMPAÑÍA EL GUATEQUE, S.A. Certificado de Título
> matrícula No. 1000009020, Libro No. 0283, Folio No. 204,
> Hoja 121. Transferido mediante contrato de venta suscrito
> con la compañía HB Inversiones del Caribe, S.A. en fecha
> 18 de diciembre de 2003, legalizado ante el Notario Público
> Dr. Manuel Joaquin Patricio Guerrero.

L.      2,634.75 square meters of land in Higuey, Dominican Republic, and more

particularly described as:

> PARCELA NO. 408 DEL DISTRITO CATASTRAL NO.
> 10/6TA DEL MUNICIPIO DE HIGUEY, CON UNA
> EXTENSIÓN SUPERFICIAL DE 2,634.75 METROS
> CUADRADOS, A NOMBRE DE COMPAÑÍA HB
> INVERSIONES DEL CARIBE, S.A.

M.      All funds in Intercredit bank account number 16008310760 (Jose Benitez).

The defendant real properties have not been seized, as provided for in 18 U.S.C. § 985, (b)(1)(A), but will be posted with a notice of the complaint in accordance with 18 U.S.C. §§ 985, (c)(1) and 985(c)(3).

6.      The United States seeks forfeiture of the defendant properties pursuant to 18 U.S.C. § 981(a)(1)(A) on the grounds that the properties were involved in transactions, or attempted transactions, in violation of 18 U.S.C. §§ 1956 and 1957.

7.      The United States seeks forfeiture of the defendant properties pursuant to 18 U.S.C. § 981(a)(1)(C) on the grounds that the defendant properties constitute or were derived from proceeds traceable to health care fraud, specifically violations of 18 U.S.C. §§ 371, 1349, and 287.

<u>THE MEDICARE PROGRAM</u>

8.      The Medicare Program ("Medicare") is a federal insurance program that provides health coverage for people age 65 years and older and for certain disabled people.   Medicare is a "health care benefit program," as defined by 18 U.S.C. § 24(b).   The United States Department of Health and Human Services ("HHS") is responsible for the administration of the Medicare program.   The Centers for Medicare & Medicaid Services ("CMS") is the component agency of HHS that administers and supervises the Medicare program.   CMS has contracted with First Coast Service Options ("First Coast") to receive, adjudicate, process and pay certain Medicare claims submitted to it by providers of medical services in the state of Florida.

9.      Part B of the Medicare Program provides medical insurance to Medicare beneficiaries.   Payments made by Medicare are often made directly to the claimed provider of the goods and services, rather than to the beneficiary.   This occurs when the provider accepts assignment of the right to payment from the beneficiary.   In that case, the provider submits its bills directly to Medicare for payment.

6

10.     Part B of the Medicare Program allows direct payment to providers and suppliers of medically necessary Human Immunodeficiency Virus ("HIV") infusion therapy treatments that are provided or ordered by physicians, clinics, and other qualified health care providers.   A health care provider that has received a Medicare provider number may file claims with Medicare to obtain reimbursement for services provided to Medicare beneficiaries.   A Medicare claim is required to set forth various types of claim related information, including the beneficiary's name and Medicare identifiers, the services provided, the dates and cost of services, and the name and identifier information for the physician or other health care provider ordering and providing the services.

11.     Medicare requires each provider to (a) bill Medicare for only reasonable and necessary medical services; (b) provide economical medical services when those services are medically necessary; (c) assure that services provided are not substantially in excess of the needs of such patients; and (d) not make false statements or misrepresentations of material facts concerning requests for payment under Medicare.

12.     To be eligible to file a claim, a health care provider – such as an HIV infusion clinic – must submit an application to Medicare to obtain a provider number.   In the application, the provider certifies that it will comply with all Medicare related laws and regulations, including those that require submission of truthful and accurate claims for reimbursement.

13.     To bill Medicare for services rendered, HIV clinics submit claims on CMS Form 1500 (a claim form) to First Coast.   When a CMS Form 1500 is submitted, the HIV infusion clinic certifies that the contents of the form are true, correct, complete, and that the form was prepared in compliance with the laws and regulations governing the Medicare program.   Some HIV infusion clinics file claims directly with First Coast; others contract with a billing service that processes the claims on behalf of the HIV infusion clinics.

## THE BENITEZ BROTHERS' HEALTH CARE FRAUD CONSPIRACY

14.     The primary type of HIV infusion services at issue in this case was drug infusion of WinRho, also known as RhoGam.   Such infusions are paid for by Medicare Part B if they are ordered by a treating physician and medically necessary for the patients.   The multiple HIV infusion clinics described herein were owned and controlled by Carlos Benitez, Luis Benitez, and Jose Benitez ("the Benitez Brothers").   The Benitez Brothers purported to provide HIV infusion services to Medicare beneficiaries at multiple HIV Infusion clinics (the "Benitez Clinics").

15.     Carlos Benitez and Luis Benitez, who were residents of Miami-Dade County, FL, owned and controlled the Benitez Clinics, known as the following:   AH Medical Office, Inc. ("AH Medical"), Advanced Medical Rehabilitation Center, Inc. ("Advanced Medical"), Best Medi Corp. ("Best Medi"), Physician's Health Med-Care ("PHMC"), Physician's Med-Care, Inc. ("PMC"), Saint Jude Rehab Center, Inc. ("Saint Jude"), Global Med-Care Corp. ("Global Med-Care"), CNC Medical Corp. ("CNC Medical"), G&S Medical Centers, Inc. ("G&S Medical"), Karla Medical Services, Inc. ("Karla Medical"), and Best Medicare Center, Inc. ("Best Medicare").

16.     From in or about December 2001 through in or about April 2004, Carlos and Luis Benitez would, among other things, refer Medicare beneficiaries to the Benitez Clinics for the purpose of submitting false and fraudulent HIV infusion therapy claims on behalf of those beneficiaries to the Medicare program.   Carlos and Luis Benitez would also direct co-conspirators to pay those Medicare beneficiaries cash kickbacks in exchange for the beneficiaries signing paperwork representing that they received legitimate HIV infusion services at the Benitez Clinics.   In reality, the HIV infusion services billed to the Medicare program on

8

behalf of these beneficiaries at the eleven clinics were either medically unnecessary or were not rendered at all.

17.     AH Medical, using an address of 8300 SW 8th Street, Miami, FL, from in or around December 2001 through in or around October 2002, submitted approximately $2.1 million dollars in claims to the Medicare program for HIV infusion services purportedly rendered at AH Medical.

18.     Advanced Medical, using an address of 601 SW 57th Street, Miami, FL, from in or around February 2002 through in or around November 2003, submitted approximately $10.6 million dollars in claims to the Medicare program for HIV infusion services purportedly rendered at Advanced Medical.

19.     Best Medi, using an address of 2912 SW 27th Avenue, Miami, FL, from in or around January 2003 through in or around June 2003, submitted approximately $18.9 million dollars in claims to the Medicare program for HIV infusion services purportedly rendered at Best Medi.

20.     PHMC, using an address of 140-142 NE 1st Avenue, Hallandale, FL, from in or around January 2003 through in or around March 2004, submitted approximately $1.7 million dollars in claims to the Medicare program for HIV infusion services purportedly rendered at PHMC.

21.     PMC, using an address of 8150 SW 8th Street, Miami, FL, from in or around August 2002 through in or around February 2004, submitted approximately $24.5 million dollars in claims to the Medicare program for HIV infusion services purportedly rendered at PMC.

22.     Saint Jude, using an address of 330 SW 27th Ave., Miami, FL, from in or around July 2003 through in or around November 2003, submitted approximately $11 million dollars in claims to the Medicare program for HIV infusion services purportedly rendered at Saint Jude.

23.     Global Med-Care, using an address of 2541 SW 27th Ave., Suite 301, Miami, FL, from in or around November 2002 through in or around April 2004, submitted approximately $10.9 million dollars in claims to the Medicare program for HIV infusion services purportedly rendered at Global Med-Care.

24.     CNC Medical, using an address of 7840 SW 121st St., Miami, FL, from in or around November 2002 through in or around April 2004, submitted approximately $6.8 million dollars in claims to the Medicare program for HIV infusion services purportedly rendered at CNC Medical.

25.     G&S Medical, using an address of 7303 W. Flagler St., Miami, FL, from in or around May 2003 through in or around January 2004, submitted approximately $14 million dollars in claims to the Medicare program for HIV infusion services purportedly rendered at G&S Medical.

26.     Karla Medical, using an address of 453 W. 40th Place, Hialeah, FL, from in or around June 2003 through in or around August 2003, submitted approximately $5 million dollars in claims to the Medicare program for HIV infusion services purportedly rendered at Karla Medical.

27.     Best Medicare, using an address of 300 SW 3rd St., Dania, FL, from in or around July 2003 through in or around December 2003, submitted approximately $9.3 million dollars in claims to the Medicare program for HIV infusion services purportedly rendered at Best Medicare.

28.     Jose Benitez was an owner and operator of Advanced Medical.   From in or about February 2002 through in or about November 2003, Jose Benitez and his brothers, Carlos and Luis Benitez, would refer Medicare beneficiaries to Advanced Medical for the purpose of submitting false and fraudulent HIV infusion therapy claims on behalf of those beneficiaries to the

Medicare program. Jose Benitez would also direct co-conspirators to pay those Medicare beneficiaries cash kickbacks in exchange for the beneficiaries signing paperwork representing that they received legitimate HIV infusion services at Advanced Medical.   In reality, the HIV infusion services billed to the Medicare program on behalf of these beneficiaries at Advanced Medical were either medically unnecessary or were not rendered at all.

29.     The Benitez Brothers employed Thomas McKenzie as a physician's assistant to train physicians and providers at their HIV infusion clinics as to how to make it appear that legitimate and appropriate medical services were being provided at the Benitez Clinics, and how to oversee the documentation of services to make it appear that the services were actually rendered and medically necessary.   On or about September 18, 2008, McKenzie pled guilty in the U.S. District Court for the Southern District of Florida to engaging in a $119 million dollar conspiracy with Carlos, Luis, and Jose Benitez to commit health care fraud and to submit false claims, based on his conduct at the Benitez Clinics.   *See United States v. Carlos Benitez, et al.*, Case No. 08-CR-20440-GOLD.

30.     The Benitez Brothers employed Rita Campos Ramirez as a medical biller at their HIV infusion clinics, for the purpose of making the fraudulent HIV infusion claims to the Medicare program appear legitimate and submitting the claims to the Medicare program.   On or about August 28, 2007, Ramirez pled guilty to engaging in a $170 million dollar conspiracy with Carlos, Luis, and Jose Benitez, among others, to commit health care fraud and to submit false claims at numerous HIV clinics including several of the Benitez Clinics.   *See United States v. Rita Campos Ramirez*, Case No. 07-CR-20633-GOLD.

31.     In addition to McKenzie and Ramirez, approximately 17 other Benitez co-conspirators have been charged for their roles in assisting in the Benitez HIV infusion fraud conspiracy.   To date, approximately 12 of those co-conspirators have pled guilty or been

convicted of the charged offenses.   These cases and defendants are described below in "Parallel Criminal Proceedings".

32.   Law enforcement agents have interviewed numerous Medicare beneficiaries who have admitted to visiting the Benitez Clinics for the sole purpose of receiving cash kickbacks, not because they needed medical treatment, and to actually receiving cash kickbacks at the Benitez Clinics.   In fact, after receiving the cash kickbacks, a number of beneficiaries actually refused treatment.   In those cases, the Benitez Clinics still billed Medicare for treatments that were not provided.

33.   Numerous clinic managers, nurses, and physicians who participated in the fraudulent scheme with the Benitez Brothers have admitted that they paid cash kickbacks to Medicare beneficiaries who attended the Benitez Clinics and that patient files were manipulated to justify medically unnecessary treatments.

34.   Medical files for several of the Medicare beneficiaries who attended the Benitez Clinics confirm that the treatments provided to those beneficiaries were not medically necessary. The drug WinRho, which was purportedly infused into the patients who attended the Benitez Clinics, is appropriate for patients with a disease called thrombocytopenia, which is evidenced by dangerously low blood platelet counts.   The medical files for Medicare beneficiaries who visited the Benitez Clinics show that the patients receiving WinRho treatments did not have thrombocytopenia.   Additionally, a medical expert in the field of HIV treatment has confirmed that the amount of WinRho billed to the Medicare program for most of the Medicare beneficiaries who attended the Benitez Clinics was more than medically credible or appropriate.

35.   In total, Carlos, Luis, and Jose Benitez submitted approximately $119 million dollars in claims to the Medicare program for HIV infusion services allegedly rendered at the

Benitez Clinics, and actually received approximately $84,336,716.19 in payments based on those fraudulent claims.

36.    In some instances, the Benitez Brothers transferred proceeds from their HIV infusion clinics to their personal bank accounts and in other instances the Benitez Brothers laundered the proceeds through various sham companies that they owned and controlled. Carlos Benitez was paid approximately $1,013,875.00 directly to his own bank accounts by the Benitez Clinics.   Luis Benitez was paid approximately $928,208.00 directly to his own bank accounts by the Benitez Clinics.   Jose Benitez was paid approximately $619,657.00 directly to his own bank accounts by the Benitez Clinics.   In addition to these payments, the Benitez Brothers were paid approximately $38,346,763.00 through various sham companies that were created for the sole purpose of laundering the proceeds from their fraud.   In total, the proceeds paid directly to the Benitez Brothers and the money paid to their sham companies, was approximately $40,908,503.00 in proceeds from their fraud.

## THE BENITEZ BROTHERS' MONEY LAUNDERING SCHEME

37.    From in or about March 2002 through in or about April 2004, the Benitez Brothers transferred proceeds of their Medicare fraud described above to numerous sham marketing and management companies they controlled to facilitate the laundering of the fraud proceeds for their own use and enjoyment.   These sham marketing and management companies included:   All Star Medical Management, Inc.; America Consulting, Inc.; Aspirine, Inc.; BBB Management Corp.; Benitez Property Investments, Inc.; Black & Red Marketing Service Inc.; CEM Management Services, Inc.; CM Management Services of Miami, Inc.; Caribbean Investments Enterprises, Inc.; Enterprise Investments, Inc.; IAA Marketing Service, Inc.; I&A Consulting Services, Inc.; JH Consulting, Inc.; J. Marketing Service, Inc.; Management & Superior, Inc.; Professional Managing Service, Inc.; RH Management Service, Inc.; and Step-Up

Investment Corp. ("the Benitez money laundering companies").   The Benitez money laundering companies provided no true marketing or management services and were used by the Benitez Brothers for the purpose of laundering the money they obtained illegally from the Medicare program.

38.     To launder the proceeds of their Medicare fraud scheme, the Benitez Brothers instructed co-conspirators to write checks to the various Benitez money laundering companies identified above.   The money was then distributed in a variety of ways.   In some instances, checks were deposited into accounts in the names of the money laundering companies.   In other instances, checks were cashed at Maytemar Corporation, d/b/a La Bamba Check Cashing ("La Bamba").   In other instances, money was transferred from the money laundering companies to accounts in the Dominican Republic.

39.     From in or around March 2003 through in or around March 2004, the Benitez money laundering companies cashed approximately $24 million dollars in proceeds of the Medicare fraud scheme using La Bamba's check cashing and funds-transferring services.

40.     When Carlos, Luis, and Jose Benitez deposited the fraudulent proceeds into the bank accounts of their money laundering companies, several wire transfers were processed from those accounts into bank accounts in the Dominican Republic.   For example, from in or about August 2003 through in or about October 2003, at least $730,000.00 was wired from accounts of the Benitez money laundering companies to two accounts at Banco de Reservas and Banco Popular Dominicano in the Dominican Republic, under the name of Carlos Benitez.

41.     In addition to wiring the proceeds of their fraud directly to their bank accounts in the Dominican Republic, Carlos, Luis, and Jose Benitez also caused proceeds of their fraud to be transferred to bank accounts of other individuals in the Dominican Republic for the purpose of concealing their interest in the tainted money.   Specifically, from in or about June 2003 through

14

in or about September 2003, Carlos, Luis, and Jose Benitez caused approximately $2,579,110.00 to be transferred from their money laundering companies into Dominican bank accounts under the names of other individuals associated with the Benitez Brothers.

42.     After transferring their fraudulent proceeds to the Dominican Republic, Carlos, Luis, and Jose Benitez used those proceeds to purchase substantial assets in the Dominican Republic, primarily real estate, business interests, and various automobiles.   The Benitez Brothers also used a portion of the proceeds of their fraud to purchase assets in the United States.

43.     A Benitez co-conspirator has stated that the Benitez Brothers spent the money they had made from the fraud on properties in the Dominican Republic, including hotels, a water park and apartment buildings.   A witness close to the Benitez Brothers confirmed that the brothers transferred money from a bank in the United States to the Dominican Republic.

44.     A Benitez co-conspirator who worked in several Benitez-owned clinics and who has pled guilty for his role in the Benitez fraud scheme, has stated that Carlos Benitez told him that he (Carlos Benitez) had purchased hotels in Punta Cana, in the eastern part of the Dominican Republic.

45.     Between 2003 and 2005 the Benitez Brothers incorporated at least four companies in the Dominican Republic to acquire properties there, among these are the following: HB Inversiones del Caribe, S.A. ("HB Inversiones") on or about July 30, 2003, HB Global Rent A Car, S.A. ("HB Global Rent A Car") on or about January 27, 2004, HB Vista Bavaro, S.A. ("HB Vista Bavaro") on or about January 27, 2004, and HT Bavaro International, S.A. ("HT Bavaro International") on or about December 14, 2005.   Other properties were acquired in the names of Carlos Benitez, Luis Benitez and Jose Benitez.   Witnesses in the Dominican Republic have stated that on several occasions, the Benitez Brothers have caused the fake, or paper, sales of

several of the properties to straw purchasers, when in reality the properties remained in the possession and control of the Benitez Brothers.

ASSETS SUBJECT TO FORFEITURE

**1,000 square meters of land in Bavaro, Dominican Republic
(Parcela 86) – Defendant A**

46.     1,000 square meters of land in Bavaro, Dominican Republic was purchased on or about January 5, 2005, and is currently titled in the name of HB Inversiones del Caribe. The property was purchased with fraud proceeds as set forth herein.

*HB Inversiones del Caribe, S.A.*

(a)     HB Inversiones was one of the companies owned and controlled by the Benitez Brothers.   *HB*, in Spanish, stands for Hermanos Benitez, which translates into *Benitez Brothers* in English.   The word *Inversiones* translates into *Investments* in English.   The word *Caribe* translates into *Caribbean* in English.

(b)     Benitez bank records confirm that Luis Benitez had a business in the Dominican Republic known as "HB Inversiones del Caribe."   According to corporate documents of HB Inversiones, the company was incorporated on or about July 30, 2003.   Carlos Benitez, Luis Benitez, Jose Benitez, Diana Esmelita Alfaro Escoto (Luis Benitez's wife), Maria Victoria Martinez (Jose Benitez's wife), Ines Benitez and Ines Maria Gonzalez Ramirez were listed as shareholders of HB Inversiones.   HB Inversiones' address was #13 Calle Bienvenido Creales, Los Naranjos, Sector Central, Municipio (Municipality) Higuey, Provincia (Province) La Altagracia, Dominican Republic.

(c)     From on or about May 12, 2003 through on or about June 14, 2005, multiple properties were purchased in the name of HB Inversiones.   On the title paperwork of

16

these properties, the buyer is listed as HB Inversiones with Carlos Benitez represented as its President.

(d)     On or about March 12, 2008, HB Inversiones' shares were purportedly transferred to individuals associated with a Mexican company, Aquakita, which was contracted to build a water park for the Benitez Brothers.   Several witnesses in the Dominican Republic, including several shareholders of Aquakita, have admitted that the sale of HB Inversiones was on paper only and that the custody and control of the company remained in the hands of the Benitez Brothers and/or their agents after the purported sale took place.

### 1,000 square meters of land in Bavaro, Dominican Republic (Parcela 86) – Defendant B

47.     1,000 square meters of land in Bavaro, Dominican Republic, was also purchased on or about January 5, 2005, and is currently titled in the name of HB Inversiones.   The property was purchased with fraud proceeds as set forth herein.

### Parcela 95-A-4-D-10 (540 square meters) - Defendant C

48.     Parcela 95-A-4-D-10 (540 square meters) was purchased on or about December 20, 2003, and is currently titled in the name of Ibrahin Martinez Jaime and Milagros Pimienta Jaca, allegedly purchased from Jose Manuel Benitez on or about November 12, 2004. Martinez Jaime has admitted that he did not purchase the property from Jose Manuel Benitez, and only signed the sales contract for this alleged sale at the direction of Jose Manuel Benitez in March or April of 2008, not in 2004.   Jose Manuel Benitez purchased the property on or about December 20, 2003. The property was purchased with fraud proceeds as set forth herein.

### Parcela 86-R (4,409 square meters) - Defendant D

49.     Parcela 86-R (4,409 square meters) was purchased on or about July 10, 2003, and is currently titled in the name of Carlos Manuel Benitez. The property was purchased with fraud proceeds as set forth herein.

### Parcela 86 (2,691.52 square meter) – Defendant E

50.     Parcela 86 (2,691.52 square meter) was purchased on or about December 11, 2006, and is currently titled in the name of HB Vista Bavaro.   The property was purchased with fraud proceeds as set forth herein.

*HB Vista Bavaro S.A.*

(a) HB Vista Bavaro was owned and controlled by the Benitez Brothers, located in the Dominican Republic.   According to corporate documents of HB Vista Bavaro, on or about January 27, 2004, Carlos Benitez, Jose Benitez, Divanna Sanchez Rijo (Carlos Benitez' significant other), Diana E. Alfaro Escoto (Luis Benitez' wife), and Maria Victoria Martinez (Jose Benitez' wife), incorporated and became shareholders of HB Vista Bavaro.   HB Vista Bavaro's address was #13 Calle Bienvenido Creales, Los Naranjos, Municipio (Municipality) Higuey, Provincia (Province) Altagracia, Dominican Republic.

(b) While Divanna Sanchez Rijo held 1,000 shares and was listed as President of HB Vista Bavaro, Jose Benitez and Luis Benitez possessed the majority of shares with 1,664 each.   On or about June 5, 2005, properties were purchased in the name of HB Vista Bavaro.

(c) Law enforcement has obtained at least one check, written on an account for HB Global Rent A Car, payable to Cabañas Vista Bavaro, that was signed by Carlos Benitez.

### Parcela 86-SUBD-3-007.5021 (1,839 square meter) - Defendant F

51.     Parcela 86-SUBD-3-007.5021 (1,839 square meter) is currently titled in the name of   El Guateque S.A.   A sales contract was executed wherein the property was purchased from El Guateque S. A. by HB Inversiones on or about December 18, 2003.   However, the sale was never recorded nor the title transferred with the Title Registry of Higuey.   The property was purchased with fraud proceeds as set forth herein.

### Parcela 86 (198 square meter) - Defendant G

52.     Parcela 86 (198 square meter) is currently titled in the name of Mario Jose Vigil Tijerino.   The property was purchased by Vigil Tijerino on or about January 23, 2004.   Vigil Tijerino was an employee of the Benitez Brothers.   Vigil Tijerino admitted that this property was in his name, but was not owned by him, instead actually owned by HB Inversiones del Caribe.   The property was purchased with fraud proceeds as set forth herein.

### Parcela 86 (14,377.00 square meters) – Defendant H

53.     Parcela 86 (14,377.00 square meter) was purchased on or about January 15, 2007 and is currently titled in the name of HT Bavaro International.   An attorney in Dominican Republic, Manuel Joaquin Patricio-Guerrero (Patricio), opened numerous companies for the Benitez Brothers including, HT Bavaro International.   HT Bavaro International was in the names of numerous shareholders.   However, the Benitez Brothers were the actual owners of HT Bavaro International.   At least one shareholder of HT Bavaro International, Justo Manuel Benitez-Abel, is a relative of the Benitez Brothers.   At least one of the founding shareholders, Manuel Suarez Pascual, declared he had no interest in this company, he did not buy any shares, he signed the corporate documents per the request of Carlos Benitez, and was an employee of the Benitez Brothers. At least two of the subsequent shareholders of HT Bavaro International,

Armando Cordova Escobar and Adrian Antonio Garcia Villarreal (or Villa Real), declared they had no assets in the Dominican Republic and did not purchase any corporate shares or stocks of companies in Dominican Republic. HT Bavaro International was incorporated by Patricio.   The property was purchased with fraud proceeds as set forth herein.

### Parcela 86 (7,860.64 square meters) – Defendant I

54.     Parcela 86 (7,860.64 square meter) was purchased on or about December 12, 2006 and is currently titled in the name of HB Vista Bavaro.   The property was purchased with fraud proceeds as set forth herein.

### Parcela 86-SUB-3 (2,515.44 square meters) – Defendant J

55.     Parcela 86-SUB-3 (2,515.44 square meters) was purchased on or about June 30, 2012 and is currently titled in the name of HB Vista Bavaro.   The property was purchased with fraud proceeds as set forth herein.

### Parcela 86-007.5022 (2,000 square meters) – Defendant K

56.     Parcela 86-007.5022 (2,000 square meters) was purchased on or about December 18, 2003 by HB Vista Bavaro, but the title change was not recorded.   It is currently titled in the name of El Guateque, S.A.   The property was purchased with fraud proceeds as set forth herein.

### Parcela 408 (2,634.75 square meters) – Defendant L

57.     Parcela 408 (2,634.75 square meters) was purchased on or about October 14, 2003, by HB Inversiones.   The property was purchased with fraud proceeds as set forth herein.

### All funds in Intercredit bank account number 16008310760 (Jose Benitez) – Defendant M

58.     All funds in Intercredit bank account number 16008310760 (Jose Benitez), opened by Jose Benitez on October 15, 2002.   The account was funded with fraud proceeds as set forth herein.

59.     A Dominican Republic attorney who was intimately familiar with the Benitez Brothers' business transactions in the Dominican Republic was interviewed regarding the defendant properties and Benitez Brothers' business affairs.   According to the attorney, the Benitez Brothers were always interested in investing in any type of business.   They invested in a chicken restaurant, a rental car business, motels, a water park, and numerous vacant real properties.

60.     From on or about December 21, 2001 through on or about January 15, 2007, the Benitez Brothers, either individually or through their corporate entities, purchased over 37 parcels of real estate in the Dominican Republic and the United States.   The Dominican Republic and Florida property documents and title certificates show that the aforementioned properties were acquired by one or more of the Benitez Brothers or by an entity that was owned and controlled by one or more of them during the course of the Medicare fraud scheme.

61.     Based upon a review of bank and tax records, Carlos, Luis, and Jose Benitez did not appear to have had any source of legitimate income during the course of their Medicare fraud conspiracy that could have generated the funds used to acquire the above-listed properties. Their only income appears to have come from the income generated from the fraudulent HIV infusion clinics.

62.     For the tax years 2002 through 2003, Carlos Benitez reported a gross income of $817,147.00.   Approximately 10% of this reported total was purportedly derived from "wages" he claimed to have earned at "Investors Enterprise, Inc." and "Enterprise Investors, Inc.," two entities the Benitez Brothers used to launder the proceeds of their Medicare fraud.   The remainder of the reported income was allegedly derived from unspecified work as an independent "consultant." However, the only known consulting work performed by Carlos Benitez during this time frame was for the sham marketing and management used to launder the proceeds of the fraud scheme.

63.    For the tax years 2002 through 2004, Luis Benitez reported an aggregate gross income of $773,919.00, of which $134,304.00 was derived from "Step-Up Investments," one of the entities used to launder the proceeds of the brothers' Medicare fraud scheme.   The remainder of his reported income is shown to have come from gambling winnings and unspecified work as an independent "consultant." However, the only known consulting work performed by Luis Benitez during this time frame was for the sham marketing and management used to launder the proceeds of the fraud scheme.

64.    For the tax years 2002 through 2004, Jose Benitez and his wife reported an aggregate gross income of $481,225.00.   Of this reported income, the tax returns reflect that $382,137.00 was derived from Advanced Medical Rehabilitation Services, one of the fraudulent HIV infusion clinics owned and controlled by the Benitez Brothers.

65.    The total income the Benitez Brothers reported during the period of the fraud substantially understates the amount of income that would have been required to acquire the properties listed in the above paragraphs.   Furthermore, the vast majority of the income that was reported does not appear to have been derived from any legitimate source.

PARALLEL CRIMINAL PROCEEDINGS

66.    On June 13, 2008, in the Southern District of Florida, a criminal indictment was filed in *United States v. Carlos Benitez, et al*. Case No. 08-20440-CR-GOLD.   The indictment charged Carlos, Luis, and Jose Benitez, as well as Thomas McKenzie with: (1) conspiracy to defraud the United States and to commit the following offenses against the United States: (a) to impair, impede, obstruct and defeat the lawful functions of the United States Department of Health & Human Services in its administration of the Medicare program, (b) to file false claims with the United States Department of Health & Human Services, and (c) to offer kickbacks and bribes for the referrals of persons for fraudulent Medicare claims, all in violation of 18 U.S.C. §

22

371; (2) conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349; (3) seven counts of submitting false claims to the United States Department of Health & Human Services, in violation of 18 U.S.C. §§ 287 and 2; (4) conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h); (5) three counts of money laundering, by engaging in monetary transactions with criminally derived property in excess of $10,000.00, in violation of 18 U.S.C. §§ 1957 and 2; and (6) three counts of money laundering, by engaging in money transactions with criminally derived property for the purpose of promoting the carrying on of the specified unlawful activities, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 2.

67.     As described above, on September 18, 2008, defendant McKenzie pled guilty to conspiring with Carlos, Luis, and Jose Benitez to commit $119 million dollars in health care fraud and to submit false claims, based on his conduct at the Benitez Clinics.   On December 18, 2008, Judge Gold sentenced McKenzie to 168 months in prison, three years of supervised release, and ordered him to pay $84 million dollars in restitution to the Medicare program.

68.     As described above, on or about August 28, 2007, medical biller Rita Campos Ramirez plead guilty to conspiring with Carlos, Luis, and Jose Benitez, among others, to commit $170 million dollars in health care fraud and to submit false claims, based in part on her billings for the Benitez Clinics.   *See United States v. Rita Campos Ramirez*, Case No. 07-20633-CR-GOLD.   On April 2, 2008, Judge Gold sentenced Campos to 120 months in prison, three years of supervised release, and ordered her to pay $105 million dollars in restitution to the Medicare program.

69.     Criminal charges have been filed in the Southern District of Florida against several other Benitez co-conspirators at the Benitez-owned HIV infusion clinics.   The status of those cases are described below.

A.    *Physician's Med-Care and Physician's Health Med-Care*

(1)    On August 26, 2008, Ronald Harris, M.D., a physician and operator of the Benitez-controlled HIV clinics Physician's Med-Care and Physician's Health Med-care, pled guilty to one count of conspiracy to defraud the United States, to pay health care kickbacks, and to cause the submission of false claims, one count of conspiracy to commit health care fraud, and three counts of submitting false claims in connection with his management of two Benitez-controlled fraudulent HIV clinics.  *See United States v. Ronald Harris*, 08-20439-CR-ALTONAGA.   In pleading guilty, Harris admitted to conspiring with Carlos and Luis Benitez to cause the submission of approximately $26 million dollars in fraudulent claims to the Medicare program at Physician's Med-Care and Physician's Health Med-Care.

(2)    On November 4, 2008, Judge Altonaga sentenced Harris to 84 months in prison, three years of supervised release, and ordered him to pay $9,882,274.00 in restitution to the Medicare program.

B.    *Saint Jude*

(1)    On April 23, 2008, Saint Jude administrator Aisa Perera pled guilty to one count of conspiracy to commit health care fraud in connection with her role in committing health care fraud at Saint Jude, a Benitez-controlled HIV clinic.  *See United States v. Mariela Rodriguez, et al*., 08-20270-CR-MORENO.   In pleading guilty, Perera admitted to conspiring with Carlos and Luis Benitez to submit over $11 million dollars in fraudulent claims to the Medicare program at Saint Jude.

(2)    On July 10, 2008, Perera was sentenced to 30 months in prison, three years of supervised release, and ordered to pay $8,289,286.00 in restitution to the Medicare program, jointly and severally with her co-defendants.

24

(3)      On August 26, 2008, Mariela Rodriguez pled guilty to one count of conspiracy to commit health care fraud and one count of making false declarations to a federal grand jury in connection with her conduct as an administrator at Saint Jude.   In pleading guilty, Rodriguez admitted to conspiring with Carlos and Luis Benitez to cause the submission of over $11 million dollars in fraudulent claims to the Medicare program at Saint Jude.

(4)      On November 4, 2008, Rodriguez was sentenced to 70 months in prison, three years of supervised release, and ordered to pay $8,289,286.00 in restitution to the Medicare program, jointly and severally with her co-defendants.

(5)      On October 17, 2008, following a two-week jury trial, Dr. Ana Alvarez was convicted of conspiring to defraud the United States in connection with her role as a physician at Saint Jude, in submitting false claims, and of conspiring to commit health care fraud.

(6)      On December 17, 2008, Alvarez was sentenced to 360 months in prison, three years of supervised release, and ordered to pay $8,289,286.00 in restitution to the Medicare program, jointly and severally with her co-defendants.

(7)      On October 17, 2008, Sandra Mateos was also convicted of conspiring to defraud the United States in connection with her role as a nurse at Saint Jude and of conspiring to commit health care fraud.

(8)      On December 17, 2008, Mateos was sentenced to 84 months in prison, three years of supervised release, and was ordered to pay $8,289,286.00 in restitution to the Medicare program, jointly and severally with her co-defendants.

C.    *Global Med-Care*

(1)    On August 22, 2008, Nayda Freire, the nominee owner of Global Med-Care, another Benitez HIV clinic, pled guilty to one count of conspiracy to commit health care fraud in connection with her role in committing health care fraud at Global Med-Care.   *See United States v. Nayda Freire*, 08-20441-CR-JORDAN.   In pleading guilty, Freire admitted to conspiring with the Benitez Brothers to cause the submission of over $10 million dollars in fraudulent bills to the Medicare program at Global Med-Care.

(2)    On November 12, 2008, Freire was sentenced to 30 months in prison, three years of supervised release, and ordered to pay $7,992,391.00 in restitution to the Medicare program.

D.    *CNC Medical*

(1)    On September 11, 2008, Dr. Carlos Contreras and Dr. Ramon Picardo each pled guilty to conspiring to commit health care fraud in connection with their roles as the doctors and administrators of CNC Medical, a Benitez HIV clinic. *See United States v. Carlos Contreras*, *et al.*, Case No. 08-20443-CR-MORENO.   In their pleas, both of these physicians admitted that they conspired with Carlos, Luis, and Jose Benitez to cause the submission of over $6 million dollars in fraudulent bills to the Medicare program at CNC Medical.

(2)    On November 20, 2008, Picardo was sentenced to 48 months in prison, three years of supervised release, and ordered to pay $4,200,000.00 in restitution to the Medicare program

(3)    On November 20, 2008, Contreras was sentenced to 37 months in prison, three years of supervised release, and was likewise ordered to pay $4,200,000.00 in restitution to the Medicare program.

26

E.     *G&S Medical*

(1)     On September 15, 2008, Dilcia Marinez pled guilty to conspiring to commit health care fraud and conspiring to launder money in connection with her role as the administrator of G&S Medical, another Benitez HIV clinic.   *See United States v. Juan Carlos Castaneda et al.*, Case No. 08-20442-CR-MORENO.   In pleading guilty, Marinez admitted to conspiring with the Benitez Brothers to cause the submission of over $14 million dollars in fraudulent bills to the Medicare program at G&S Medical.

(2)     On November 18, 2008, Marinez was sentenced to 57 months imprisonment, three years of supervised release, and ordered to pay $9,600,000.00 in restitution to the Medicare program.

(3)     Marinez's co-defendants, Juan Carlos Castaneda and Luis Frias, also pled guilty to assisting Marinez in laundering the proceeds of her crimes at G&S Medical and were likewise sentenced on November 18, 2008.   Castaneda was sentenced to 87 months in prison and three years of supervised release.   Frias was sentenced to 27 months in prison and three years of supervised release.

<u>FIRST CLAIM FOR RELIEF</u>

70.     Plaintiff United States realleges paragraphs 1 through 69 above as if fully set forth herein.

71.     Based on the totality of the circumstances described above, the defendant properties constitute, or were derived from, proceeds traceable to health care fraud violations as described above, including 18 U.S.C. § 371, which criminalizes conspiracies to impair, impede, obstruct and defeat the lawful functions of the United States Department of Health & Human Services in its administration of the Medicare program, conspiracies to file false claims with the United States Department of Health & Human Services, conspiracies to offer kickbacks and

bribes for the referrals of persons for fraudulent Medicare claims; 18 U.S.C. § 1349, which criminalizes conspiracies to commit health care fraud; and 18 U.S.C. § 287, which criminalizes the making or presentation to an officer or department of the United States any claim upon the United States known to the presenter to be false, fictitious or fraudulent.

72.    Pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, that constitutes or is derived from proceeds traceable to a violation of any offense constituting specified unlawful activity, or a conspiracy to commit such offense, shall be subject to forfeiture to the United States.

73.    Pursuant to 18 U.S.C. § 1956(c)(7)(F), any act or activity constituting an offense involving a federal health care offense constitutes a specified unlawful activity.

74.    Based on the foregoing, the defendant properties are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

<u>SECOND CLAIM FOR RELIEF</u>

75.    Plaintiff United States realleges paragraphs 1 through 69 above as if fully set forth herein.

76.    Based on the totality of the circumstances as described above, the defendant properties constitute properties, real and personal, which were involved in transactions or attempted transactions in violation of 18 U.S.C. §§ 1956(a)(1) and 1956(a)(2), or constitute property traceable to such property.

77.    Pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, that is involved in a transaction or attempted transaction in violation of any provision of 18 U.S.C. § 1956, or property traceable to such property, shall be subject to forfeiture to the United States.

78.    Pursuant to 18 U.S.C. § 1956(a)(1)(A), anyone who, knowing that property involved in a financial transaction, represents the proceeds of some form of unlawful activity,

conducts or attempts to conduct a financial transaction which in fact involves the proceeds of specified unlawful activity, knowing the transaction is designed in whole or in part to conceal the nature, the location, the source, the ownership, or the control of proceeds of a specified unlawful activity commits an offense.

79.     Pursuant to 18 U.S.C. § 1956(a)(2)(B), anyone who transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States, knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity commits an offense.

80.     Pursuant to 18 U.S.C. § 1956(c)(7)(F), any act or activity constituting an offense involving a federal health care offense constitutes a specified unlawful activity.

81.     Based on the foregoing, the defendant properties are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

<u>THIRD CLAIM FOR RELIEF</u>

82.     Plaintiff United States realleges paragraphs 1 through 69 above as if fully set forth herein.

83.     Based on the totality of the circumstances as described above, the defendant properties constitute properties, real and personal, which were involved in transactions or attempted transactions in violation of 18 U.S.C. § 1957, or constitute property traceable to such property.

84.     Pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, which is involved in a transaction or attempted transaction in violation of any provision of 18 U.S.C. § 1957, or property traceable to such property, shall be subject to forfeiture to the United States.

85.     Pursuant to 18 U.S.C. § 1957, anyone who knowingly engages in or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000.00 which is derived from specified unlawful activity, commits an offense.

86.     Pursuant to 18 U.S.C. § 1956(c)(7)(F), any act or activity constituting an offense involving a federal health care offense constitutes a specified unlawful activity.

87.     Based on the foregoing, the defendant properties are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

<u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiff United States requests that:

A.     A Notice of Complaint be issued for the defendant real properties and a Warrant of Arrest and/or Summons be issued for the defendant personal properties;

B.     The Court direct any and all persons having any claim to the defendant properties to file and serve their Verified Claims and Answers as required by 18 U.S.C. § 983(a)(4) and the Supplemental Rules for Certain Admiralty and Maritime Claims, or suffer default thereof;

C.     The defendant properties be condemned and forfeited to the United States for disposition according to law; and that Plaintiff be granted such other relief as this Court may deem just and proper, together with the costs and disbursements of this action.

<u>CONCLUSION</u>

By reason of the foregoing, and pursuant to the provisions of 18 U.S.C. § 981 (a)(1)(A) and (C), the defendant properties as described herein have become and are forfeit to the United States of America.

**WHEREFORE**, plaintiff, United States of America, requests the Court to declare the defendant properties condemned and forfeit to the United States of America, pursuant to 18 U.S.C. §§ 981 (a)(1)(A) and (C), and further requests the Court to direct any and all persons having any claim to the defendant properties, to file and serve their verified claims and answers as required by G(5) of the Supplemental Rules for Certain Admiralty and Maritime Claims, or suffer default thereof, together with such other and further relief as may be just and proper.

Dated:     February 5, 2015

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY

By:     /s/ Mark W. Lester
MARK W. LESTER (FL Bar # 851620)
Assistant U. S. Attorney
500 S. Australian Ave., Suite 400
West Palm Beach, FL    33401
Fla. Bar No. 851620
TEL (561) 820-8711
FAX (561) 655-9785
Mark.Lester@usdoj.gov

M. KENDALL DAY, Acting Chief
ASSET FORFEITURE AND
MONEY LAUNDERING SECTION

By:    /s/ Robert Stapleton
            Robert Stapleton,
            Asset Forfeiture and Money Laundering Section
            Criminal Division, U.S. Department of Justice
            1400 New York Avenue, N.W.
            N.Y. Bar No. 4076568
            Washington, D.C. 20530
            Phone: (202) 514-9247
            Fax:    (202) 514-5522
            Email: Robert.Stapleton@usdoj.gov

<u>VERIFICATION</u>

I, Jose Loureiro, Special Agent for the Federal Bureau of Investigation, declare under penalty of perjury as provided by 28 U.S.C. § 1746, that the foregoing Complaint for Forfeiture *in rem* is based on information known to me, and the facts alleged therein are true and correct to the best of my knowledge.

_____
SPECIAL AGENT JOSE LOUREIRO
Federal Bureau of Investigation
Dated: _February 2nd_____, 2015